UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
VICTOR KING,                                                          Case No.:

                    Plaintiff,

                                                            <u>COMPLAINT</u>

    -against-

SUCCESS ACADEMY CHARTER SCHOOLS,        PLAINTIFF DEMANDS A TRIAL
INC.,                                              BY JURY

                    Defendant.
-------------------------------------------------------------X

        Plaintiff, VICTOR KING, by Plaintiff's attorneys, PHILLIPS & ASSOCIATES, ATTORNEYS AT LAW, PLLC, hereby complains of the Defendant, upon information and belief, as follows:

### Nature of the Case

1.    Plaintiff complains pursuant to 42 U.S.C. § 1981 (hereinafter "Section 1981"), Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*; the New York State Human Rights Law, New York Executive Law § 296, *et. seq.* ("NYSHRL"); and the New York City Human Rights Law, New York City Administrative Code § 8-502(a), *et seq.* ("NYCHRL"). Plaintiff seeks damages to redress the injuries Plaintiff has suffered as a result of being discriminated against, subjected to a hostile work environment, and retaliated against by his employer solely due to his race (Black) and his complaints of discrimination.

### Jurisdiction and Venue

2.    Jurisdiction of this Court is proper under 42 U.S.C. § 2000e-5(f)(3), 42 U.S.C. § 1981 and 28 U.S.C. §§ 1331 and 1343.

3.     The Court has supplemental jurisdiction over Plaintiff's claims brought under state law pursuant to 28 U.S.C. § 1367.

4.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), as the acts complained of occurred within the Southern District of the State of New York.

## Procedural Prerequisites

5.     Plaintiff filed charges of discrimination upon which this Complaint is based with the Equal Employment Opportunity Commission ("EEOC").

6.     Plaintiff received a Notice of Right to Sue ("Notice") from the EEOC, dated February 14, 2022, with respect to the herein charges of discrimination. A copy of the Notice is annexed hereto as Exhibit A.

7.     This Action is being commenced within ninety (90) days of receipt of said Notice.

8.     Contemporaneously with the filing of this Complaint, Plaintiff mailed a copy of the Complaint to the New York City Commission on Human Rights ("NYCCHR") and the Office of the Corporation Counsel of the City of New York ("Corporation Counsel") pursuant to the notice requirements of Section 8-502 of the New York City Administrative Code. A copy of the transmittal letter to the NYCCHR and the Corporation Counsel is annexed hereto as Exhibit B.

## Parties

9.     At all times material, Plaintiff is a resident of the County of Dutchess, State of New York.

10.    Plaintiff is Black.

11.    At all times material, Defendant SUCCESS ACADEMY CHARTER SCHOOLS, INC. (hereinafter "SACS") was a foreign not-for-profit corporation organized under the laws of

the State of Delaware and operating in the State of New York.  The registered address of Defendant SACS is 95 Pine Street, Floor 6, New York, New York 10005.

12.    At all times material, Defendant SACS owns, maintains, and operates multiple charter school locations within the New York City metropolitan area, including the SACS location located at 145 West 84th Street, New York, New York 10024 (hereinafter "the Location") where the discriminatory conduct alleged herein took place.

13.    At all times material, Defendant SACS had 15 or more employees.

14.    At all times material, Defendant SACS was Plaintiff's employer under Title VII.

15.    At all times material, Defendant SACS was Plaintiff's employer under the NYSHRL.

16.    At all times material, Defendant SACS was Plaintiff's employer under the NYCHRL.

17.    At all times material, all parties mentioned herein worked and/or continue to be employed at the Location.

## **Material Facts**

18.    On or about July 22, 2020, Plaintiff was hired by Defendant SACS as a third-grade teacher earning approximately $50,000 per year.

19.    Plaintiff was qualified for his position and always performed his duties well.

20.    Plaintiff's wife, who is white, was also hired as a teacher by Defendant SACS, but was placed at a different location.

21.    On or about August 24, 2020, Plaintiff began working at the Location as a third-grade teacher.

22.    Plaintiff was the only non-white male teacher employed at the Location.

23.    At times material, classrooms were being taught virtually due to the COVID-19 pandemic,.

24.     Upon information and belief, all Defendant SACS classrooms were equipped with two teachers – one "Lead" teacher and an "Associate" teacher who would be guided by the "Lead" teacher.

25.     When Plaintiff began working at the Location, Plaintiff was one of three teachers in his classroom. It was unusual that he was one of three teachers in the classroom, when most other classrooms were only staffed with two teachers.

26.     In or around late August 2020, Plaintiff, enthusiastically, tried to learn the ropes to be an efficient teacher at Defendant SACS.  Plaintiff's co-teachers, Erica Cohen and Kiera Nemsick, informed Plaintiff that they did not have time to train Plaintiff because the beginning of the school year was hectic. Plaintiff was frustrated but continued his duties to the best of his abilities.

27.     Upon information and belief, a Lead teacher's job responsibilities include the duty to train new co-teachers.

28.     In or around September 2020, Plaintiff asked the principal at the location, Regina Westlake, why his classroom had three teachers and other classrooms had two teachers.  Ms. Westlake responded, in sum and substance, "we over hired."  Plaintiff was confused but continued his duties as a third-grade teacher.

29.     In or around mid-September 2020, Ms. Westlake called Plaintiff and asked if Plaintiff wanted to transfer to the Washington Heights location of Defendant SACS.  Ms. Westlake stated, in sum and substance, "we found out that you are bilingual and diverse and there's a position open in Washington Heights. You're also in a group of three – do you want to transfer?"  Plaintiff immediately informed Ms. Westlake that he did not wish to transfer locations as he applied to the Location specifically.  Ms. Westlake responded, in sum and

substance, "it is your choice, but think about it with your wife and let me know on Monday." Plaintiff believed that Ms. Westlake recommended Plaintiff transfer to Washington Heights because he is Black, and Washington Heights has a significant Black community as opposed to the Location on the Upper West Side that has a more significant white community. Plaintiff was shocked, insulted, and disappointed with Ms. Westlake's suggestion to transfer.

30.     Later that day, Plaintiff spoke with co-teachers and explained that Ms. Westlake wanted him to transfer schools. Plaintiff's senior co-teacher, Ms. Cohen, stated, in sum and substance, "[The Location] is a very prestigious location. You should have taken the position in Washington Heights because [Ms. Westlake] wanted you to." Plaintiff was upset that he was not getting support from his fellow co-workers.

31.     To Plaintiff's dismay, Ms. Nemsick stated, in sum and substance, "that's strange. I saw something similar happen last year with a Black woman. They wanted her to transfer to Washington Heights too, which she did. They told her it 'would be good for [Defendants SACS'] future and it was what they wanted. She ended up quitting." Plaintiff was floored.

32.     Plaintiff subsequently contacted his assistant principal, Jose Ojeda and relayed Ms. Westlake's comments.  Mr. Ojeda dismissed Plaintiff's concerns and informed Plaintiff that he should have taken the position because Ms. Westlake asked him to.  Plaintiff was upset that he continued to receive no support from anyone at Defendant SACS.

33.     That following Monday, Plaintiff contacted Ms. Westlake and informed her that he wished to remain at the Location.  Ms. Westlake's tone changed immediately and she stated, in sum and substance, "I was really expecting you to [transfer]. This is really disappointing me. The next time you are considered for a transfer, you will not be offered the

opportunity." Plaintiff was uncomfortable with Ms. Westlake's reaction and tone and informed her that he was going to reach out to Human Resources about their conversation.

34. That same week, Plaintiff reached out to Defendant SACS Human Resources Department to request a meeting.

35. On or about late September 2020, Plaintiff had a meeting with Michael Smith, a representative from Defendant SACS Human Resources Department. Plaintiff informed Mr. Smith about what occurred during his call with Ms. Westlake the week prior. Plaintiff explained that he wanted to document the incident as per the instructions he received during orientation training. Plaintiff informed Mr. Smith that he was extremely uncomfortable and was looking for guidance. Mr. Smith asked Plaintiff to elaborate on his feelings. Plaintiff explained that he felt like an outsider as he was the only Black teacher at the Location, and he is the third teacher in his classroom and that his principal was trying to transfer him away.

36. Shockingly, Mr. Smith responded to Plaintiff's concerns by stating, in sum and substance "Are you sure? It seems like you are bringing your baggage and your past here from your prior job. I have been working here, and no one here is racist. I think you are making a bigger deal out of the situation than necessary." Plaintiff was upset and outraged by Mr. Smith's comments. Mr. Smith was clearly implying that as a Black man, Plaintiff must have assumed his non-Black co-workers are racist due to some unrelated past trauma. Plaintiff was offended and rebutted Mr. Smith's insinuations and assumptions.

37. Plaintiff was also upset that Mr. Smith appeared to have immediately reached his own conclusions about Plaintiff's complaint without doing any type of investigation.

38.   In or around early October 2020, Plaintiff and Mr. Smith had a meeting.  Mr. Smith informed Plaintiff that he had spoken to Ms. Westlake about the situation.  Mr. Smith explained that Ms. Westlake claimed she was uncomfortable with Plaintiff because Ms. Westlake felt that Plaintiff would call her racist no matter what she said or did.  Due to Ms. Westlake's comments, Mr. Smith recommended that Plaintiff transfer to a different location within Defendant SACS. Plaintiff was confused and in disbelief that Plaintiff's concerns of racism were now being flipped onto him.

39.   In or around early October 2020, Plaintiff had a meeting with Ms. Westlake and Mr. Smith. Plaintiff felt as if he had no other option but to agree to the transfer.  However, to Plaintiff's surprise, Ms. Westlake informed Plaintiff that he could only transfer during the next school year.  Ms. Westlake went on to explain that she felt uncomfortable around Plaintiff, and that she believed that Plaintiff would call her racist for anything she did or said to Plaintiff. Ms. Westlake stated that she was worried "how to manage and deal with an employee like that."   Plaintiff became even more uncomfortable and upset, especially because his concerns regarding racism were never addressed.

40.   Since the conversations Plaintiff had with his co-teachers regarding Ms. Westlake's attempt at transferring him, Plaintiff's co-teachers began treating him differently.

41.   Plaintiff would often be left out of important co-teacher parent meetings and planning meetings which would include lesson planning and other planning details in preparation for upcoming class lessons.

42.   Ms. Cohen and Ms. Nemsick, in the presence of Plaintiff, would discuss how they met the night prior to either lesson plan or grade.  Plaintiff felt left out as he was never invited to these meetings.

43.    At certain grade-team meetings with Ms. Cohen, Ms. Nemsick, Mr. Ojeda, and other third-grade co-teacher teams, Plaintiff would become aware of other planning meetings between Ms. Cohen and Ms. Nemsick from which Plaintiff was excluded.  Ms. Cohen and Ms. Nemsick would propose ideas and lesson plans to Mr. Ojeda and the other third-grade co-teacher teams.  Plaintiff remained silent during these meetings as he was unaware of the lesson plans since he was not included in the meetings with Ms. Cohen and Ms. Nemsick.

44.    Upon information and belief, Defendant SACS policy is that all co-teachers attend their planning meetings. Further, co-teachers should not exclude other co-teachers out of planning meetings.

45.    Additionally, Plaintiff noticed that his work-related direct messages to his co-teachers would go unnoticed and unanswered.  Frustrated, Plaintiff would instead send messages in a larger group chat with other third-grade teachers. This would often generate a response from other co-teachers.

46.    Plaintiff's co-teachers refused to provide him with the opportunity to teach a lesson in a class, but instead designated Plaintiff miniscule administrative tasks, such as taking attendance.

47.    In or around early October 2020, Plaintiff received an e-mail late at night from Ms. Cohen. Within the e-mail, Ms. Cohen provided Plaintiff with a detailed list of daily actions – many of which Plaintiff was regularly completing as they were basic tasks, such as taking attendance. Plaintiff was confused by Ms. Cohen's e-mail and believed he was being unnecessarily targeted.

48.    Upon information and belief, no other associate teachers received a similar e-mail.

49.   Upon information and belief, Plaintiff was being retaliated against due to his complaints, and because he was the only non-white male teacher at the Location.

50.   The following day, Plaintiff asked Ms. Cohen why she sent him an e-mail about his duties, rather than simply discussing it with him in person. In response, Ms. Cohen explained that she did not believe that Plaintiff was doing enough work on his own and it is his responsibility to ask his co-teachers for more work.  Ms. Cohen went on to state, in sum and substance, "we do not have the time to coddle [Plaintiff's] teaching development." Plaintiff was humiliated and uncomfortable.

51.   Still feeling upset about the interaction from a few days' prior with Ms. Cohen, Plaintiff approached his co-teachers again regarding his work and duties.  In response to Plaintiff's concerns, Ms. Cohen and Ms. Nemsick stated, in sum and substance, "we do not have time to train and catch you up on the content."  Plaintiff explained that he is trying his best.  Ms. Cohen and Ms. Nemsick did not respond or engage in any further discussion.  Instead, Ms. Cohen and Ms. Nemsick spoke about non-work-related topics.  Plaintiff felt frustrated, alone, and unheard.

52.   Shortly thereafter, Plaintiff approached Mr. Ojeda regarding his failed discussions with Ms. Cohen and Ms. Nemsick.  Plaintiff explained that he attempted to speak to his co-teachers regarding the lack of work and feeling left out of class-planning discussions, along with their responses.  Mr. Ojeda responded, in sum and substance, "I don't believe that you were not being trained or not being involved in the work.  Your co-teachers are the best." Plaintiff reiterated his concerns he had with his co-teachers.   Mr. Ojeda dismissed Plaintiff's concerns and told him to "try harder."  Plaintiff was shocked and offended by Mr. Ojeda's failure to address his concerns.

53.     In or around late October 2020, approximately one week after Plaintiff spoke with Mr.
        Ojeda, Ms. Cohen and Ms. Nemsick began contacting Plaintiff incessantly to "remind" him
        to complete minor tasks which he was completing without issue, such as taking attendance.
        At times, Ms. Cohen and Ms. Nemsick "reminded" Plaintiff to complete lesson plans on
        his own, without any guidance, in a short timeframe. Plaintiff felt as if he was starting to
        become micro-managed and was being set up to fail. Plaintiff started to feel extremely
        anxious.

54.     Upon information and belief, co-teachers complete their lesson planning materials together
        as a group to provide insight and guidance to the newer teacher in the classroom.

55.     In or around early November 2020, Plaintiff brought his concerns to Ms. Cohen and Ms.
        Nemsick. Plaintiff explained that other associate teachers at the Location were being
        trained and treated differently than how he was being trained and treated.  Ms. Cohen and
        Ms. Nemsick again, ignored his concerns.

56.     Shortly thereafter, Plaintiff, once again, decided to speak with Mr. Ojeda. Plaintiff
        explained that he was being treated unfairly and explained the unfair and unrealistic
        deadlines that he was provided to create lesson plans on his own. Plaintiff stated that he
        felt left out and was receiving the cold shoulder from his fellow co-teachers.  In response,
        Mr. Ojeda dismissed his concerns and told Plaintiff that he was "not trying hard enough."
        Plaintiff felt defeated.

57.     Upon information and belief, Mr. Ojeda did not address Plaintiff's ongoing concerns due
        to his close relationship with Ms. Cohen.

58.     At times, Plaintiff observed Mr. Ojeda and Ms. Cohen discuss their personal lives,
        including discussing how many children they would like to have.

59.     Plaintiff had also observed Mr. Ojeda tell Ms. Cohen, in sum and substance, "I am so glad [Ms. Cohen] came back to this location. I trust you as my right-hand man."

60.     In or around early November 2020, Plaintiff contacted Defendant SACS's Human Resources Department to document his concerns with his co-teachers and his assistant principal, Mr. Ojeda.  Plaintiff explained that he was not granted the opportunity to be involved in planning meetings with his co-teachers. In response, Mr. Smith, Defendant SACS's Human Resources representative, stated, in sum and substance, "sounds like something you need to work out in your team." Plaintiff was frustrated and felt like he was continuously hitting dead-ends.

61.     After the meeting with Mr. Smith, Plaintiff messaged Mr. Smith several times providing updates on the continued dismissive conduct by his co-teachers.  Mr. Smith again informed Plaintiff, in sum and substance, "you need to work this out within your team."

62.     Shortly after speaking with Mr. Smith, Plaintiff approached Mr. Ojeda and expressed his concerns about being treated differently due to his race. In response, Mr. Ojeda stated, in sum and substance, "Victor, I am Hispanic too. I don't feel like that so this must be all in your head."

63.     In or around mid-November 2020, Plaintiff had to undergo a medical procedure and had to take a medical leave of absence.  While on leave, Plaintiff contacted Mr. Ojeda to follow up on his complaints. Plaintiff heard back from Mr. Ojeda the following day, who told Plaintiff, in sum and substance, "you need to let it go and enjoy your vacation. You are not allowed to work at all due to your surgery.  They are not responding to you because you shouldn't be reaching out to anyone at work while you're recovering."

64.     On or about November 20, 2020, Plaintiff e-mailed Mr. Ojeda informing him that his co-teachers were making him uncomfortable. Specifically, Plaintiff stated, in sum and substance, "I hope you are doing well. I am still feeling like nothing has been resolved with my co-teachers. I understand that you have a good relationship with them, and I know you are all close, but this is not fair and I feel unheard." Mr. Ojeda never responded to Plaintiff's e-mail.

65.     Since Plaintiff never received a response from Mr. Ojeda, Plaintiff decided to e-mail Ms. Westlake. Plaintiff reiterated his concerns that he had about his co-teachers and explained that he reached out to Mr. Ojeda, but Mr. Ojeda never responded to his e-mail.  Ms. Westlake, appearing to be annoyed by Plaintiff's e-mail, responded and stated in sum and substance "I thought Mr. Ojeda already talked to you about not e-mailing during your recovery from surgery."  Plaintiff responded and apologized to Ms. Westlake.

66.     On or about November 30, 2020, Plaintiff returned to work. Ms. Westlake and Mr. Ojeda had a meeting with Plaintiff regarding his e-mails.  Ms. Westlake and Mr. Ojeda told Plaintiff, in sum and substance "do not e-mail your concerns because we do not want to create a paper trail."  Plaintiff was upset as it was clear that neither his principal, assistant principal, nor co-teachers cared about his complaints.

67.     Despite Plaintiff's complaints, Plaintiff continued to be mistreated and ignored by Ms. Cohen and Ms. Nemsick.

68.     In or around December 2020, Plaintiff told Ms. Cohen and Ms. Nemsick that he felt repeatedly ignored and poorly trained.  Plaintiff stated that Ms. Cohen and Ms. Nemsick resisted any conversations that Plaintiff attempted to start with them in order to cure their estranged relationship.  Plaintiff continued to be unheard.

69.     On or about January 26, 2021, Plaintiff had a scheduled appointment to receive his COVID-19 vaccine. Plaintiff took the day off of work, which was approved ahead of time.

70.     On or about January 27, 2021, Plaintiff was at work but was feeling unwell.  Plaintiff informed Ms. Cohen, Ms. Nemsick, and Mr. Ojeda that he was feeling unwell so he may need to turn off his camera for certain parts of the day.

71.     On or about January 28, 2021, Plaintiff was still feeling unwell.  Mr. Ojeda suggested Plaintiff take the remainder of the day off, but Plaintiff resisted and stated he would be able to continue working.

72.     On or about January 29, 2021, Plaintiff was still feeling unwell and took a sick day. However, on that day Plaintiff had his mid-year review scheduled.  Mr. Ojeda stated that it would not be a problem and the review could be done at a later time.

73.     On or about February 1, 2021, a winter storm rattled the northeast region. As a result, Plaintiff's power went out at his home. Plaintiff contacted Mr. Ojeda and his co-teachers informing him that his power went out.  Mr. Ojeda immediately questioned the validity of the power outage by stating, in sum and substance, "how are you chatting with me if your power is out?"  Plaintiff explained that he was able to use the Slack App on his cell phone to communicate with him. Mr. Ojeda responded, in sum and substance, "I am going to give you a call at 4:00 P.M."

74.     Similarly, Plaintiff's wife contacted her respective assistant principal to advise that her power was also out. Her assistant principal responded, in sum and substance, "no problem. Jump back on when you get power back."

75.     On or about February 1, 2021, Mr. Ojeda called Plaintiff with Ms. Westlake on the line. Ms. Westlake informed Plaintiff that he was terminated.  Plaintiff was in shock and asked

why he was being terminated.  In response, Ms. Westlake stated, in sum and substance, "you're not a good fit." Plaintiff questioned what it meant not to be a good fit, to which Ms. Westlake responded, in sum and substance, "it's obvious, you're not a good fit. There is nothing more to talk about."

76.    Plaintiff was shocked and extremely upset at this blatantly retaliatory discharge.

77.    But for Plaintiff raising complaints of race discrimination, he would have not been terminated.

78.    The above are just some of the comments and conduct which contributed to the race-based hostile work environment that Plaintiff experienced on a regular basis while employed by Defendant SACS.

79.    Plaintiff was repulsed, offended, disturbed, humiliated, victimized, and disgusted by this blatantly unlawful racial harassment, discrimination, and hostile work environment.

80.    Defendant SACS created a hostile work environment, which unreasonably interfered with Plaintiff's ability to perform Plaintiff's job.

81.    Defendant SACS' actions and conduct were intentional and intended to harm Plaintiff.

82.    Defendant SACS discriminated against Plaintiff solely due to his objections to the discriminatory and retaliatory actions taken against Plaintiff.

83.    Defendant SACS unlawfully discriminated against, retaliated against, humiliated, degraded and belittled Plaintiff. As a result, Plaintiff suffers loss of rights, emotional distress and loss of income.

84.    Plaintiff was subjected to such a discriminatory, retaliatory, hostile and abusive work environment that no reasonable person in Plaintiff's shoes could or should be expected to endure.

85. As a result of the acts and conduct complained of herein, Plaintiff has suffered a loss of employment, income, the loss of a salary, loss of bonus, loss of benefits, other compensation which such employment entails, special damages, and great inconvenience.

86. As a result of the acts and conduct complained of herein, Plaintiff has suffered future pecuniary losses, emotional pain, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.  Plaintiff has further experienced severe emotional and physical distress.

87. Defendant SACS acted maliciously, willfully, outrageously, and with full knowledge of the law.

88. As such, Plaintiff demands punitive damages against Defendant SACS.

**First Cause of Action for Discrimination**
**Under 42 U.S.C. § 1981 (As Amended)**

89. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

90. 42 U.S.C. § 1981 provides, in pertinent part:

    (a) Statement of Equal Rights.  All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

91. Defendant SACS engaged in unlawful employment practices prohibited by 42 U.S.C. § 1981, by discriminating against Plaintiff because of his race (Black).

92. Defendant SACS violated the sections cited herein as set forth.

93. Plaintiff is entitled to the maximum amount allowed under this statute.

**Second Cause of Action for Retaliation**
**Under 42 U.S.C. § 1981 (As Amended)**

94.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

95.    By the acts and practices described above, Defendant SACS retaliated against Plaintiff for her opposition to unlawful discrimination under 42 U.S.C. § 1981.

96.    Defendant SACS acted with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

97.    Defendant SACS violated the sections cited herein as set forth.

98.    Plaintiff is entitled to the maximum amount allowed under this statute.

**Third Cause of Action for Discrimination**
**Under Title VII**

99.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

100.    Title VII of the Civil Rights Act of 1964, as amended, at 42 U.S.C. § 2000e–2(a), titled "employer practices," provides that:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

101.    Defendant SACS violated the sections cited herein as set forth.

### Fourth Cause of Action for Retaliation
### <u>Under Title VII</u>

102.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of

this complaint.

103.   Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3(a) provides, in

pertinent part, that it shall be unlawful employment practice for an employer:

> (1)      to… discriminate against any of his employees…because he
> has opposed any practice made by an unlawful employment practice
> by this subchapter, or because he has made a charge, testified,
> assisted, or participated in any manner in an investigation,
> proceeding, or hearing under this subchapter.

104.   Defendant SACS violated the sections cited herein as set forth.

### Fifth Cause of Action for Discrimination
### <u>Under the New York State Executive Law</u>

105.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of

this complaint.

106.   New York State Executive Law § 296(1) provides that:

> It shall be an unlawful discriminatory practice:
>
> (a) For an employer or licensing agency, because of an individual's
> age, **race**, creed, color, national origin, sexual orientation,
> military status, sex, disability, predisposing genetic
> characteristics, familial status, marital status, or domestic
> violence victim status, to refuse to hire or employ or to bar or to
> discharge from employment such individual or to discriminate
> against such individual in compensation or in terms, conditions
> or privileges of employment.

107.   Defendant SACS engaged in an unlawful discriminatory practice by creating and

maintaining a hostile work environment and otherwise discriminating against Plaintiff

because of his race (Black).

108.   Defendant SACS violated the sections cited herein as set forth.

109.    Plaintiff is entitled to the maximum amount allowed under this statute.

**Sixth Cause of Action for Retaliation**
**Under the New York State Executive Law**

110.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of

this complaint.

111.    New York State Executive Law § 296(1) provides that:

It shall be an unlawful discriminatory practice:

(e)  For any employer, labor organization or employment agency to
discharge, expel or otherwise discriminate against any person
because he or she has opposed any practices forbidden under
this article or because he or she has filed a complaint, testified
or assisted in any proceeding under this article.

112.    Defendant SACS violated the sections cited herein as set forth.

113.    Plaintiff is entitled to the maximum amount allowed under this statute.

**Seventh Cause of Action for Discrimination**
**Under the New York City Administrative Code**

114.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of

this complaint.

115.    New York City Administrative Code § 8-107(1) provides that:

It shall be an unlawful discriminatory practice: (a) For an employer
or an employee or agent thereof, because of the actual or perceived
age, race, creed, color, national origin, gender, disability, marital
status, partnership, status, caregiver status, sexual orientation,
uniformed service, or alienage or citizenship status of any person, to
refuse to hire or employ or to bar or to discharge from employment
such person or to discriminate against such person in compensation
or in terms, conditions or privileges of employment.

116.    Defendant SACS violated the sections cited herein as set forth.

117.    Plaintiff is entitled to the maximum amount allowed under this statute.

**Eighth Cause of Action for Retaliation**
**Under the New York City Administrative Code**

118.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

119.   New York City Administrative Code § 8-107(7) provides that it shall be unlawful discriminatory practice: "For an employer…to discriminate against any person because such person has opposed any practices forbidden under this chapter…"

120.   Defendant SACS violated the sections cited herein as set forth.

121.   Plaintiff is entitled to the maximum amount allowed under this statute.

**Ninth Cause of Action for Vicarious Liability**
**Under the New York City Administrative Code**

122.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

123.   New York City Administrative Code § 8-107(13) provides for employer liability for discriminatory conduct by an employee, agent or independent contractor.  This sub-section states:

> a. An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions one and two of this section.

> b. An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where: (1) the employee or agent exercised managerial or supervisory responsibility; or (2) the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or (3) the employer should have known of the

19

employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

c. An employer shall be liable for an unlawful discriminatory practice committed by a person employed as an independent contractor, other than an agent of such employer, to carry out work in furtherance of the employer's business enterprise only where such discriminatory conduct was committed in the course of such employment and the employer had actual knowledge of and acquiesced in such conduct.

124.    Defendant SACS violated the sections cited herein as set forth.

125.    Plaintiff is entitled to the maximum amount allowed under this statute.

## **Jury Demand**

126.    Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendants:

A.    Declaring that Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. § 1981, as amended, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., the New York State Human Rights Law, New York State Executive Law § 296, *et. seq.*, and the New York City Human Rights Law, New York City Administrative Code § 8-502(a), *et seq.*, in that Defendant discriminated against Plaintiff and created a hostile work environment based on Plaintiff's race (Black) and retaliated against Plaintiff due to his complaints of discrimination, resulting in his unlawful termination;

B.    Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendant's unlawful harassment, discrimination, retaliation, and conduct and to otherwise make Plaintiff whole for any losses suffered because of such unlawful employment practices;

C.    Plaintiff compensatory damages for mental and emotional injury, distress, pain, suffering and injury to Plaintiff's reputation in an amount to be proven;

D. Awarding Plaintiff damages for loss of income, the loss of a salary, bonus, benefits, and other compensation which such employment entails;

E. Awarding Plaintiff punitive damages;

F. Awarding Plaintiff liquidated damages;

G. Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of this action; and

H. Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy Defendant's unlawful employment practices.

Dated:  New York, New York
　　　　May 12, 2022

PHILLIPS & ASSOCIATES,
ATTORNEYS AT LAW, PLLC

By:　　 _____
Steven Fingerhut
*Attorneys for Plaintiff*
45 Broadway, Suite 430
New York, New York 10006
(212) 248-7431
sfingerhut@tpglaws.com

EEOC Form 161-B (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | **Mr. Victor King**<br>**C/O Phillips & Associates 45 Broadway, Suite 430**<br>**New York, NY 10006** | From: | **New York District Office**<br>**33 Whitehall St, 5th Floor**<br>**New York, NY 10004** |
|---|---|---|---|

| | EEOC Representative: | Telephone No.: |
|---|---|---|
| **EEOC Charge No.:**<br>520-2021-04464 | Christiana Doriety,<br>Federal Investigator | (917) 410-4022 |

*(See also the additional information enclosed with this form.)*

<u>**NOTICE TO THE PERSON AGGRIEVED**</u>:

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

- Less than 180 days have elapsed since the filing date. I certify that the Commission's processing of this charge will not be completed within 180 days from the filing date.

- The EEOC is terminating its processing of this charge.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

VANESSA GUEST
Digitally signed by VANESSA GUEST
Date: 2022.02.14 10:22:27 -05'00'

FOR

2-14-2022

Enclosures(s)

**Judy A. Keenan,**
**District Director**

*(Date Mailed)*

cc:  **Diane Windholz, Esq.**
**Attorney for Respondent**
diane.windholz@jacksonlewis.com

**Steven Fingerhut, Esq.**
**Attorney for Charging Party**
sfingerhut@tpglaws.com

Enclosure with EEOC
Form 161-B (11/09)

# INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS    --    Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you *receive* this Notice**.  Therefore, you should **keep a record of this date**.  Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost.  If you intend to consult an attorney, you should do so promptly.  Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it.  Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction.  (Usually, the appropriate State court is the general civil trial court.)  Whether you file in Federal or State court is a matter for you to decide after talking to your attorney.  Filing this Notice is not enough.  You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief.  Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge.  Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office.  If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS    --    Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible.  For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008.  This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above.  Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION    --    Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer.  Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney).  Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case.  If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice).  While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case.  Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice**.  (Before filing suit, any request should be made within the next 90 days.)

***IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.***